_____

No. 96-1896
_____

Estate of Jeffrey L. Davis,      *
by Mark L. Ostenfeld,          *
Public Administrator of the      *
City of St. Louis,               *
                                 *
          Appellee,              *
                                 * Appeal from the United
     v.                          * States District Court for
                                 * the Eastern District of
Paul K. Delo, Gregory Dunn,      * Missouri
Greg Conaway, David McPeak,      *
Billy Davis, Jim Underwood    *
and Phillip Wade,                *
                                 *
          Appellants.            *


_____

Submitted: December 11, 1996

Filed: June 16, 1997
_____

Before WOLLMAN and MURPHY, Circuit Judges, and TUNHEIM,[1] District Judge.
_____

TUNHEIM, District Judge.


Appellants, correctional officers and prison administrators, appeal from an order[2] entering judgment against them under 42 U.S.C. § 1983. At the conclusion of a bench trial, the district court found that appellants had violated inmate Jeffrey Davis-El's constitutional right to freedom from cruel and unusual punishment

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

by using excessive force while removing him from his prison cell. The court awarded plaintiff $10,000.00 in compensatory damages against seven defendants jointly and severally, and awarded punitive damages of $5,000.00 each against two of the defendants. We affirm.

I.    BACKGROUND

A.    The Use of Force

Jeffrey L. Davis-El ("Davis") was an inmate at the Potosi Correctional Center ("PCC") in Potosi, Missouri. In November 1992, Davis filed a complaint alleging that prison guards used excessive force against him while removing him from his cell on October 3, 1992. At that time, defendant Paul Delo was the Superintendent of PCC. Defendants Gregory Dunn, Gregory Conaway, David McPeak, Billy Davis, Jim Underwood and Phillip Wade were corrections officers at PCC.

On October 3, 1992, prison officials conducted a routine search of Davis' housing unit. Each inmate was required to "cuff up" before corrections officers entered and searched his cell. Each inmate was required to stand with his back against the cell door and place his hands behind his back and through the food slot in the cell door to allow officers to handcuff him. Davis was ordered to "cuff up," but instead of placing his back to the door, he faced the door and inserted his hands through the slot. An officer ordered Davis to turn around. Davis slowly removed his hands from the slot and turned his back to the officers. The officers construed Davis' slow movements as a refusal to obey an order, and shut the food slot before he had finished turning around. Davis then requested the presence of a higher-ranking corrections officer.

In response, defendant Dunn, a zone lieutenant, assembled a "movement team," the object of which is to restrain and remove an inmate from his cell with physical force. A movement team is comprised of five corrections officers, each of whom is assigned a role in restraining the inmate. One restrains the inmate's head and upper torso, one restrains each of the inmate's arms, and one restrains each of the inmate's legs. The officers wear protective padding and a helmet, but do not carry weapons.

The trial court made findings of fact regarding the PCC's policies with respect to the use of movement teams. The movement team's objective is to gain physical control of the inmate with minimal risk of injury to the corrections officers and the inmate. Once the decision to employ a movement team is made, physical force is used to restrain the inmate, regardless of whether he resists. The officers are not authorized, however, to use physical force beyond that which is necessary to maintain or regain control. The court found that if each member of the team competently performs his assigned task and the inmate does not resist, the probability of injury to either the officers or the inmate is remote, and that 200 instances of use of a movement team at PCC had resulted in only two serious injuries to inmates. One was the injury at issue in this appeal; the other was an incident in which an inmate's arm was broken.

Missouri Department of Corrections procedures require that each member of the movement team and any other official observing the use of force submit a written report of the incident which should include a description of any injuries sustained by corrections officers or inmates. The incident is also videotaped. There is an official process for review of the movement team's activity. A "use-of-force packet" is assembled which includes officers' reports, the videotape, medical reports, any allegations

of abuse by the inmate, a conduct violation report issued to the inmate, and the outcome of any internal investigation.

The packet is reviewed by a series of supervisory personnel, beginning with the officer in charge of the exercise, and ending with the prison superintendent. The prison superintendent reviews the use-of-force packet and makes a determination as to whether the movement team used appropriate force. The packet is then sent to the central office of the Missouri Department of Corrections, where it is reviewed by the security coordinator, the assistant director of adult institutions, and an internal affairs officer. The packet is also reviewed by the Missouri Department of Public Safety and a citizens' advisory committee which does not have the authority to order an internal investigation.

The trial court also made findings of fact regarding the movement team exercise in Davis' cell on October 3, 1992, and the aftermath of the exercise. Defendant Dunn was the designated supervisor of the movement team. The movement team was comprised of defendants McPeak, Conaway, Davis, Underwood, and Wade. McPeak was responsible for restraining the inmate's head and upper torso, Davis and Conaway were each responsible for one of his arms, and Wade and Underwood were each responsible for one of his legs. Another corrections officer was responsible for videotaping the movement team's activities. A licensed practical nurse ("LPN")was present to observe and to examine Davis following the use of force.

Dunn chose McPeak to lead the movement team because of his stature, agility and ability to quickly regain control of inmates. Dunn arrived at Davis' cell at approximately 1:25 p.m. Davis attempted to explain his response to the order to "cuff up." Before he had finished, Dunn ordered him to lie face down on the floor with his head opposite the cell door. Davis immediately

complied and the movement team entered his cell in a single file.  The trial court found that McPeak lunged onto Davis as he lay unmoving on the cell floor.  The court also found that McPeak then repeatedly struck Davis about the head and face, and smashed Davis' chin against the cell's concrete floor.  Although appellants Davis, Conaway, Wade and Underwood were in a position to have seen or heard the assault, as they were securing Davis' limbs, each testified that they did not see McPeak strike him.  The trial court specifically found that this testimony was not credible.

After Davis was restrained, he was carried from his cell, the cell was searched, and he was carried back into the cell.  The LPN wiped blood from his head, face, and chest and off the floor.  Davis requested further medical treatment, but refused to be treated while lying on the floor in his cell in restraints.  The LPN construed Davis' statements as a refusal of medical care.  Davis was instructed to remain on the floor and his leg restraints were removed.  The movement team left his cell.  The door to the cell was locked and Davis' hand restraints were removed.

The movement team disbanded at approximately 1:34 p.m.  Davis continued to complain to corrections officers that he needed medical treatment for a cut on his chin.  He was transported to a medical center some time after 4:00 p.m.  The cut on Davis' chin required internal and external sutures.  The treating physician also ordered x-rays of Davis' head, torso and extremities due to the existence of numerous other contusions and lacerations.

B.    The Institution's Response

Each member of the movement team submitted the required written account of the movement team's activities to the appropriate supervisor. None of these reports mentioned any injury

to plaintiff. Superintendent Delo reviewed the use-of-force packet, and observed from the videotape that Davis was bleeding immediately after the use of force, but he did not immediately order an investigation. The videotape of the incident was lost after it was forwarded to the Missouri Department of Corrections and had not been located as of the date of trial.

The day after the incident, Davis saw defendant McPeak. As Davis passed by, McPeak pointed at him, laughed, and said, "Keep your chin up. Next time it will be your teeth." Plaintiff saw McPeak again the next day. McPeak pointed at him and laughed.

On October 9, 1992, six days after the incident, James Bush, district assistant for the fourth senatorial district of Missouri, visited Davis at PCC. Bush is responsible for investigating and responding to inmate complaints of mistreatment by corrections officers. At that time, Bush observed that Davis' eyes and the right side of his face were bruised and swollen and saw the sutures in his chin. Davis told Bush that McPeak had beaten him.

Defendant Delo, as superintendent of PCC, was responsible for investigating all inmate claims of excessive force. Delo testified that he could not recall any prior report of abuse or excessive force by an inmate against McPeak. PCC does not track inmate complaints against individual corrections officers; thus, there is no official record of the frequency of complaints of abuse against a particular corrections officer.

The trial court found, however, that Delo had received several complaints about McPeak in the past. Davis had drafted letters to Delo on behalf of other inmates on a number of occasions complaining that McPeak had used excessive force. Delo had not ordered any internal investigations, but had nevertheless concluded

that these claims lacked merit. James Bush had also expressed concern to Delo about corrections officers' treatment of inmates at PCC on a number of occasions prior to this incident. Bush had specifically recommended to Delo on one or two occasions that certain corrections officers, including McPeak, be discharged or reassigned due to persistent complaints that the officers used excessive force against inmates. Delo never ordered any investigations into these complaints or any interview with Bush.

Defendant McPeak served as a corrections officer at PCC from May 1989 to December 1993. During that time, he participated in a number of use-of-force exercises. Defendant Dunn supervised at least 10 of these exercises. In May 1991, a corrections officer reported that McPeak used excessive force against an inmate and conspired with other corrections officers not to report the incident. An investigation into the incident resulted in McPeak's 20-day suspension for failing to report a use of force.[3] In August 1993, after the incident at issue in this appeal, McPeak was charged again with failing to report injuries an inmate sustained during a use of force. In December 1993, McPeak was discharged for using unnecessary force against an inmate and failing to report the incident.

On October 7, 1992, Davis filed an internal resolution request charging the movement team with using excessive force. Delo then

---

[3]The trial court also stated in a footnote that Dunn supervised McPeak in a use of force in which the inmate's arm was broken and that this was the incident for which McPeak was suspended for 20 days. The parties both acknowledge that this factual finding was erroneous. While there is evidence in the record supporting the fact that McPeak was suspended for 20 days for failure to report a use of force, there is no evidence in the record indicating that this discipline was for the incident in which an inmate's arm was broken. Nor is there evidence in the record indicating that McPeak was present during that incident.

began an investigation into the incident. Delo testified that he that did not initiate an investigation sooner because it could not "definitely be determined" that Davis was injured during the use of force because he had refused to be treated by the LPN immediately after the incident. Delo, however, admitted that, based on the LPN's written statement that plaintiff was bleeding from an unknown source following the movement team's exercise, he was "fairly certain" and did not "think there was any doubt" that Davis was injured during the use of force.

## C. The Trial Court's Order

Following a bench trial, the court entered judgment for plaintiff and against defendants Delo, Dunn, McPeak, Conaway, Davis, Underwood and Wade, jointly and severally, for $10,000.00 compensatory damages. The court concluded that McPeak maliciously and sadistically used force against plaintiff for the purpose of causing him harm in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. The court also found that the other four members of the movement team, Conaway, Davis, Underwood and Wade, failed to intervene or protect plaintiff from McPeak's use of excessive force. The court found that they observed McPeak strike plaintiff, but failed to take any affirmative action to protect him from a substantial risk of serious harm.

The court found that Dunn, the lieutenant responsible for the movement team's actions, had knowledge of the substantial risk of harm to plaintiff and tacitly authorized the use of excessive force by selecting McPeak to serve on the movement team despite his knowledge of McPeak's propensity to use excessive force against inmates. The court further found that Superintendent Delo had knowledge of and was deliberately indifferent to the substantial risk of harm posed by McPeak's propensity to use excessive force.

Based on its conclusion that McPeak's use of force and Delo's failure to protect appellee each demonstrated a willful and wanton disregard of plaintiff's rights under the Eighth Amendment, the court awarded punitive damages of $5,000.00 each against McPeak and Delo.

## II.  Analysis

### A.  Standard of Review.

In reviewing a district court's order entering judgment after a bench trial, we review the district court's findings for clear error.  Fed. R. Civ. P. 52(a).  Under this standard, we will overturn a finding of fact only if it is not supported by substantial evidence in the record, if the finding is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error has been made.  Sawheny v. Pioneer Hi-Bred Int'l, Inc., 93 F.3d 1401, 1407-08 (8th Cir. 1996).  A district court's choice between two permissible views of evidence cannot be clearly erroneous.  Moody v. Proctor, 986 F.2d 239, 241 (8th Cir. 1993). We also must give due regard to the district court's opportunity to judge the credibility of the witnesses.  Fed. R. Civ. P. 52(a).

Whether the trial court erred in concluding that defendants' actions constituted cruel and unusual punishment is a legal issue we review de novo.  Moody, 986 F.2d at 241.  The denial of qualified immunity is also a legal issue we review de novo.  Cornell v. Woods, 69 F.3d 1383, 1390 (8th Cir. 1995).

### B.  McPeak

Appellant McPeak assets that the trial court's conclusion that he acted maliciously and sadistically in order to cause Davis harm is not supported by the evidence and constitutes reversible error. In excessive force cases, the district court must determine whether the force was applied "in a good faith effort to maintain or restore discipline, or maliciously or sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6 (1992). The Court must consider the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate. Id. at 7.

Our review of the record reveals ample evidence to support the district court's conclusion as to defendant McPeak. It is an uncontroverted fact that Davis complied with the order to lie face down on the floor and did not at any time resist the movement team's effort to restrain him. Defendant McPeak acknowledged that he threw himself on top of Davis' head and torso. McPeak denied striking Davis, but Davis testified that McPeak struck him in the head and face 20 to 25 times. The record substantiates the trial court's finding that Davis suffered serious injuries as a result of the incident, including both internal and external sutures of a cut on his chin, and swelling and bruising to his face which was visible almost a week later.

The trial court found Davis' testimony regarding the beating more credible, and therefore found that McPeak repeatedly struck Davis. Credibility determinations are uniquely within the province of the trier of fact. Fed. R. Civ. P. 52(a); Anderson v. City of Bessemer, 470 U.S. 564 (1985). Given that the court found Davis' testimony to be credible, the court's finding that the physical force expended to control Davis vastly exceeded the amount of force required supports its conclusion that McPeak used force maliciously

and sadistically for the purpose of causing Davis harm. The court's conclusion is also supported by evidence that McPeak taunted and threatened Davis on the day after the incident.

McPeak also asserts that the trial court erroneously failed to grant him qualified immunity. Government officials performing discretionary functions are entitled to immunity from civil damages. Harlow v. Fitzgerald, 457 U.S. 800 (1982). Officials may nevertheless be held liable if their conduct violates clearly established rights of which a reasonable official would have known. Harlow, 102 S. Ct. at 2738. The trial court found that a reasonable prison official should have known that repeatedly striking an inmate's head on a concrete floor when the inmate's limbs were being restrained by four other officers and the inmate offered no resistance would violate clearly established law. See Whitley v. Albers, 475 U.S. 312, 321 (1986) ("inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur"). Department of Corrections policy authorizes use of only the amount of force necessary to maintain control. Superintendent Delo testified that any use of force, even a single blow to the head, would have constituted excessive force under the circumstances. We agree that the law was well established that striking an unresisting inmate 20 to 25 times in the head while four other officers were restraining his limbs and two other officers were standing by to assist if necessary, is a violation of the Eighth Amendment's prohibition of cruel and unusual punishment. We find no error in the trial court's denial of McPeak's claim to qualified immunity.

C.    Conaway, Davis, Underwood and Wade

The four other members of the movement team assert that the trial court erred in finding them liable for their actions on October 3, 1992. A prison official may be liable for failure to protect an inmate from a use of excessive force if he is deliberately indifferent to a substantial risk of serious harm to an inmate. Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994); Buckner v. Hollins, 983 F.2d 119, 122 (8th Cir. 1993) (quoting Estelle v. Gamble, 429 U.S. 97, 105 (1976)).

The trial court found that the nature of each member of the movement team's duties was such that each member would have been in a position to see or hear an assault by McPeak and that it would have been impossible for them not to see McPeak strike Davis. In reaching this conclusion, the trial court considered the proximity of the movement team members to McPeak, the nature of McPeak's actions, the substantial risk of serious harm to Davis, Davis' actual injuries, and the fact that none of the movement team members reported any injury in their use of force reports. The court concluded that the credible evidence established that the movement team members observed McPeak strike Davis, yet did nothing to protect him from the substantial risk of serious harm posed by McPeak's blows. We find no clear error in the district court's factual findings, which were based on its credibility determinations. The trial court's finding of liability as to the movement team members is supported by substantial evidence in the record.

The movement team members also assert that the trial court erred in denying their claims of qualified immunity. The law was clearly established at the time of the incident that prison officials may be liable for failure to protect an inmate from a use of excessive force if they are deliberately indifferent to a substantial risk of serious harm to the inmate. Buckner, 983 F.2d

at 122 (quoting Estelle v. Gamble, 429 U.S. 97, 105 (1976)).  The trial court found that the movement team members witnessed McPeak beating an inmate and did nothing to intervene and therefore violated a clearly established right of which a reasonable corrections officer would have known.  The trial court's conclusion that the movement team members were deliberately indifferent to a substantial risk of serious harm to the inmate is supported by the record.

D.    Dunn

Defendant Dunn asserts that the trial court erred in finding him liable for his actions in connection with the use of force.  Dunn was the supervisor of the movement team.  He testified he chose McPeak to lead the movement team because of his reputation for quickly regaining control of unruly inmates.  The court found that Dunn had supervised a minimum of 10 use-of-force exercises involving McPeak prior to the incident at issue.  The court also found that McPeak was suspended for 20 days after one of those incidents for failure to report a use of force which resulted in serious injuries to an inmate.  The court further found that, like the movement team members, Dunn was present during and observed the entire use-of-force exercise and observed that plaintiff was bleeding following the use of force, yet failed to report plaintiff's injury in his written account of the incident.

Both parties acknowledge that the trial court's finding that Dunn was aware that McPeak had been involved in a use of force in which an inmate's arm was broken was not supported by the record and was therefore clearly erroneous.  Appellee also acknowledges that the trial court's finding of liability was based in large part on this erroneous finding of fact, as the trial court found Dunn liable for his decision to choose McPeak to lead the movement team

when he was aware of the previous disciplinary action against McPeaks for use of excessive force.

Appellee urges the court to uphold the trial court's judgment against Dunn on a different theory. Dunn, like the other four members of the movement team, was present during the use of force and was in a position to observe McPeak's actions. Dunn also failed to intervene to protect the inmate and failed to include the injury in his report on the use of force. We agree with appellee that there is no basis for distinguishing between the movement team members' liability and Dunn's liability. See Burgess, 39 F.3d at 218 (supervisor present during alleged use of excessive force could be found to be deliberately indifferent for failure to intervene). We therefore find that the court's erroneous factual finding was harmless, and affirm the trial court's judgment against Dunn and its denial of Dunn's claim of qualified immunity.

E. Delo

Superintendent Delo asserts that the trial court erred in finding that he was on notice that McPeak had a tendency to use excessive force, but that he failed to take appropriate action, and in concluding that this failure constituted deliberate indifference to a substantial risk of serious harm to Davis. Delo testified that he could not recall any previous complaints of abuse or excessive force regarding McPeak and that he had no knowledge that McPeak had been reprimanded for failure to report a use of force. The trial court found that this testimony was not credible. The trial court found that Delo had knowledge that McPeak had a propensity to use excessive force for several reasons. The evidence established that Delo had authorized an internal investigation into an incident in which McPeak failed to report a

use of force and received a 20-day suspension.[4]  There is also  evidence in the record indicating that Delo received written complaints alleging that McPeak used excessive force against other inmates, but that Delo failed to order investigations of any of these complaints.  Furthermore, there is evidence that senatorial assistant Bush informed Delo on one or two occassions that McPeak was one of several corrections officers who should be discharged or reassigned due to persistent complaints that the officers used excessive force against inmates.  Delo took no action in response to this information.

Given Delo's knowledge of these previous complaints, and the fact that he was the only individual who could have ordered investigations into these allegations of excessive force prior to the decision to choose McPeak in a planned use of force, the trial court concluded that Delo had been deliberately indifferent to a substantial risk of serious harm to inmates. We find that the record adequately supports the trial court's conclusion. The record also supports the trial judge's denial of Delo's claim of qualified immunity.

---

[4]As previously noted, the parties agree that the trial court erred in concluding that this use of force resulted in serious injury to an inmate.  The trial court erroneously concluded that McPeak was disciplined for a different use of force in which an inmate's arm was broken.  We find that this error was harmless. There is evidence in the record which the trial court did not cite which indicates that the disciplinary action against McPeak was for an incident in which he denied hitting the inmate, but admitted to an investigator that the fact that the inmate was "pretty banged up" was the reason why the officers "didn't do the paperwork."  We find that the trial court would have reached the same result had it considered the facts supported by the record.  See Largent v. United States, 910 F.2d 497 (8th Cir. 1990) (error harmless where inadmissible evidence was just one of several factors leading to legal conclusion and court would have reached same result had it not considered evidence).

We also affirm the trial court's award of punitive damages against McPeak and Delo.  An award of punitive damages is within the discretion of the finder of fact and will not be disturbed unless it appears to be unfair and shocking.  <u>Jackson v. Crews</u>, 873 F.2d 1105 (8th Cir. 1989).  Punitive damages may be recovered in a § 1983 case when a defendant's conduct is shown to be motivated by malicious or evil motive or intent, or when it involves reckless or careless disregard or indifference to an inmate's rights or safety.  <u>Smith v. Wade</u>, 461 U.S. 30 (1983).  The trial court found evidence of malicious or evil intent in McPeak's beating Davis about the head and face while Davis offered no resistence, and taunting and threatening Davis the following day.  The court found Delo acted with reckless or careless disregard for Davis' safety in refusing to investigate or take remedial action after numerous complaints were made regarding McPeak's use of excessive force.  The trial court awarded punitive damages against McPeak and Delo in the amount of $5,000.00 each.  We do not find this award to be unfair or shocking; thus, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.